UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GEFT OUTDOOR, L.L.C.,              )
                                  )
            Plaintiff,            )
                                  )
       v.                         )       No. 1:19-cv-01257-JRS-MPB
                                  )
MONROE COUNTY, INDIANA,           )
MONROE COUNTY BOARD OF ZONING     )
APPEALS,                          )
                                  )
            Defendants.           )

**Order on Motions for Summary Judgment**

GEFT Outdoor LLC ("GEFT") sought to erect a digital billboard in Monroe County, Indiana ("County"), but its specific plans did not mesh with the County's sign ordinance. After the County denied GEFT's application for a variance, GEFT filed suit under 42 U.S.C. § 1983, alleging that the sign ordinance violates the First Amendment as incorporated against the states under the Fourteenth Amendment. GEFT moves for partial summary judgment on all claims other than that for damages. (ECF No. 53.) The County moves for summary judgment on all claims. (ECF No. 63.) For the following reasons, the motions are granted in part and denied in part.

## I.    Background

In Monroe County, outdoor signs must comply with the County's sign ordinance ("Sign Standards"). The announced purpose of the Sign Standards is "to promote public health, safety, and welfare . . . ." Ord. § 807-1. More specifically, two of the

County's goals in enacting the ordinance were "maintaining and enhancing the aesthetic environment and the County's ability to attract tourism and other sources of economic development and growth," Ord. § 807-1(3), and "improving pedestrian and traffic movement and safety (e.g., maintaining appropriate sight distances at intersections and reducing distractions)," Ord. § 807-1(4). A "sign" includes any "device, fixture, placard, or structure that uses any color, form, graphic, illumination, symbol, or writing . . . to communicate information of any kind to the public." Ord. § 801-2.

Under the Sign Standards, "except as otherwise provided, no person shall erect, repair, or relocate any sign as defined herein without first obtaining a permit from the Administrator." Ord. § 807-3. The Administrator is currently the County Planning Director. (Wilson Dep. Tr. 31:21–23, ECF No. 54-2.) Generally, a speaker wishing to publish a sign must submit an application and pay a fee. Ord. § 807-3(A). The County Planning Director will issue a sign permit only if "the proposed sign is in compliance with all of the requirements of this zoning ordinance." Ord. § 807-3(B). Those requirements include limits on placement, illumination, maintenance, height, setback, and numerosity. Ord. §§ 807-5, 807-6(A), 807-6(C)–(F). The Sign Standards do not specify a time limit for the County Planning Director to act on any given application.

Not every sign requires a permit, however. The Sign Standards exempt four kinds of signs from the permit requirement:

(1)     Any sign of not more than one and one-half (1-1/2) square feet in area; provided, that no more than one sign shall be permitted per zone lot;

2

(2)     Any governmental sign;
(3)     Sculptures, fountains, mosaics and design features which do not incorporate advertising or identification;
(4)     Temporary noncommercial signs or devices meeting the following criteria:

    a)     Each zone lot shall be allocated a total of thirty-two (32) square feet of temporary signs or devices.

    b)     Temporary signs or devices may be located no less than ten (10) feet from any other sign or structure;

    c)     Freestanding temporary signs or devices may not exceed six (6) feet in height;

    d)     External illumination of temporary signs or devices is prohibited.

However, if banners, streamers, pennants, balloons, propellers, strung light bulbs, or similar devices are used as the temporary signs or devices they may only be displayed for a period of no longer than forty-eight (48) hours.

Ord. § 807-3(C). Some of these terms are words of art. A governmental sign is defined as "[t]raffic or other civic signs, signs required by law or emergency, railroad crossing signs, legal notices, and any temporary, or non-commercial signs as are authorized under policy approved by the County, State, or Federal government." Ord. § 801-2.

"'Temporary sign' means any sign that is intended to be displayed for a limited period of time and is not permanently anchored or secured to a building or not having supports or braces permanently secured to the ground, including but not limited to: banners, pennants, or advertising displays including portable signs." *Id*. A "Commercial Message" is "[a]ny sign wording, logo, or other representation that, directly or indirectly, names, advertises, or calls attention to a business, product, service, or other commercial activity." *Id*. And a "Noncommercial Message" is just the opposite: a sign that "carries no message, statement, or expression related to the commercial interests of the . . . person responsible for the sign message." *Id*.

3

There is also a section of the Sign Standards called "Prohibited Signs," which bans certain categories of signs even if the sign would otherwise be allowed:

(1)     Portable signs are prohibited.
(2)     All animated or changeable copy signs (including digital billboards), or signs which move by mechanical means or by the movement of air are prohibited.
(3)     Temporary signs or devices consisting of a series of banners, streamers, pennants, balloons, propellers, strung light bulbs, or similar devices are prohibited, except as allowed in 807-3(C)(4).
(4)     Snipe Signs[.][1]
(5)     Off-Premise Commercial Signs, except as allowed in 807-4(B).[2]

Ord. § 807-6(B).  An "Off-Premises Sign" is one that "directs attention to a business, commodity, service or entertainment not conducted, sold or offered on the premises where the sign is located, or which business, commodity, service or entertainment forms only minor or incidental activity upon the premises where the sign is displayed." Ord. § 801-2.  In contrast, an "On-Premises Sign" is one that "advertises or directs attention to a business, commodity, or service conducted, offered, or sold on the premises, or directs attention to the business or activity conducted on the premises." *Id.*

Someone who wants to post a noncompliant sign in the County is not wholly without recourse.  As the Indiana Code requires whenever a local government adopts a zoning ordinance,[3] the County has established a Board of Zoning Appeals ("BZA")

---

[1] Though not challenged in this case, a "snipe sign" is a "temporary sign illegally tacked, nailed, posted, pasted, glued, or otherwise attached to trees, poles, stakes, fences, or other objects." Ord. § 801-2.
[2] Section 807-4(B) is a grandfather clause.
[3] *See* Ind. Code § 36-7-4-901 ("As a part of the zoning ordinance, the legislative body shall establish a board of zoning appeals."); Ind. Code § 36-7-4-918.4 (board of zoning appeals must decide use and design variances).

and a process for obtaining variances.  The BZA makes all variance decisions for the County, including variances from the requirements of the Sign Standards.  Ord. § 812-1.  After the BZA receives an application for a variance, within thirty days, the BZA must schedule and announce a date and time for a public hearing.  Ord. § 812-3(A).  The variance approval procedure lists several notice requirements for interested parties.  Ord. §§ 812-3(D)–(F).  After the hearing, the BZA must approve the application, approve the application with conditions, or deny the application. Ord. § 812-3(H); *see also* Ord. § 812-7 (BZA has authority to make approval contingent on any condition imposed "to protect the public health, and for reasons of safety, comfort and convenience").  But, beyond scheduling a hearing within a certain timeframe, there is no enumerated time limit within which the BZA must act on any given variance application.  (Defs.' Ans. 1st Interrogs. ¶ 8, ECF No. 54-5.)

To approve a use variance, the BZA must find that

(A)   the approval will not be injurious to the public health, safety, and general welfare of the community;

(B)   the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner;

(C)   the need for the variance arises from some condition peculiar to the property involved;

(D)   the strict application of the terms of the Zoning Ordinance will constitute an unnecessary hardship if applied to the property for which the variance is sought; and,

(E)   the approval does not interfere substantially with the Comprehensive Plan. Especially, the five (5) principles set forth in the Monroe County Comprehensive Plan[.][4]

Ord. § 812-5.

---

[4] The Comprehensive Plan is the "inclusive physical, social, and economic plans and policies . . . for the development of the County . . . ."  Ord. § 801-12.

To approve a design variance, the BZA must find that the applicant has adduced "substantial evidence establishing that, if implemented:"

(A)    the approval, including any conditions or commitments deemed appropriate, will not be injurious to the public health, safety, and general welfare of the community, because:

    (1)    it would not impair the stability of a natural or scenic area;
    (2)    it would not interfere with or make more dangerous, difficult, or costly, the use, installation, or maintenance of existing or planned transportation and utility facilities;
    (3)    the character of the property included in the variance would not be altered in a manner that substantially departs from the characteristics sought to be achieved and maintained within the relevant zoning district. . . .
    (4)    it would adequately address any other significant public health, safety, and welfare concerns raised during the hearing on the requested variance;

(B)    the approval, including any conditions or commitments deemed appropriate, would not affect the use and value of the area adjacent to the property included in the variance in a substantially adverse manner, because:

    (1)    the specific purposes of the design standard sought to be varied would be satisfied;
    (2)    it would not promote conditions (on-site or off-site) detrimental to the use and enjoyment of other properties in the area . . . ; and,
    (3)    it would adequately address any other significant property use and value concerns raised during the hearing on the requested variance; and,

(C)    the approval, including any conditions or commitments deemed appropriate, is the minimum variance necessary to eliminate practical difficulties in the use of the property, which would otherwise result from a strict application of the terms of the Zoning Ordinance.

Ord. § 812-6.

GEFT is a limited-liability company that buys or leases land and builds, maintains, and operates signs on its properties. (Lee Aff. ¶ 3, ECF No. 54-1.) GEFT leases part of the property at 2500 West Industrial Park Drive in Bloomington,

Indiana (part of Monroe County).  (*Id.* ¶ 4.)  That property is right next to I-69, a major thoroughfare in the County.  (*Id.*)  GEFT wants to build a digital billboard on the property, (*id.* ¶ 5)—a billboard that exhibits digital images and text, which GEFT can control by computer—to display all sorts of commercial and noncommercial speech, (*id.* ¶ 7).  On its other billboards, GEFT has tended to display a mix of 62 percent commercial speech and 38 percent noncommercial speech.  (*Id.* ¶ 8.)  It has the requisite state permit from the Indiana Department of Transportation that it needs to erect digital billboards.  (*Id.* ¶ 6.)

On January 16, 2019, GEFT sought variances from the Sign Standards for a digital billboard to be built at the Bloomington property.  Specifically, the variances were from the changeable copy ban, Ord. § 807-6(B)(2); the off-premises commercial sign ban, Ord. § 807-6(B)(5); the sign area standards, Ord. § 807-6(D); height requirements, Ord. § 807-6(F)(1); side/rear yard setback requirements, Ord. § 807-6(F)(2); and front yard setback requirements, Ord. § 807-6(F)(3).  The BZA held a hearing on March 6, 2019, and it unanimously denied GEFT's application.  (Lee Aff. ¶ 11, ECF No. 54-1.)

On March 28, 2019, GEFT filed suit against the County, invoking 42 U.S.C. § 1983 and a state statute.  GEFT challenges the Sign Standards as an unlawful content-based regulation and an unlawful prior restraint, both allegedly in violation of the First Amendment as it is incorporated against the states.  The parties move for summary judgment.  (ECF Nos. 53, 63.)

## II.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the movant discharges its initial burden, the burden shifts to the nonmovant, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). The Court must construe all facts and any reasonable inferences arising from them in favor of the nonmovant. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

## III.    Discussion

"Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend I. According to GEFT, the Sign Standards violate the First Amendment because they are an unlawful content-based regulation and because they amount to a prior restraint that lacks procedural safeguards. These grounds for invalidity hinge on separate lines of reasoning, so the Court will address each charge in turn.

GEFT brings a facial challenge to the County's ordinance.  "Facial invalidation is, manifestly, strong medicine, that is to be used sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (cleaned up).  Facial challenges on First Amendment grounds lie where a statute "substantially suppresses otherwise protected speech vis-à-vis its plainly legitimate sweep." *Bell v. Keating*, 697 F.3d 445, 456 (7th Cir. 2012) (cleaned up).  As will become clear, the Sign Standards here are substantially overbroad on their face because they contain content-based distinctions and because they, in part, grant excessive discretion to government officials.  The Court therefore entertains GEFT's facial challenge.

## A.  Count I: Content-Based Regulation

In Count I, GEFT contends the sign scheme is a content-based law that fails strict scrutiny.  Addressing that contention requires the Court to address several smaller inquiries: (1) whether the ordinance is content-based, (2) what level of scrutiny applies, and (3) whether the ordinance passes the applicable level of scrutiny.[5]

### 1.  Content Neutrality After *Reed v. Town of Gilbert*

The initial question is whether the ordinance is content-neutral or content-based. This area of First Amendment jurisprudence is in flux.  Under the Supreme Court's

---

[5] It may be worth explaining why the Court is framing its analysis of Count I around these three steps.  Other courts have said that certain kinds of regulations dealing with lower-value speech, such as commercial-speech regulations, are not subject to strict scrutiny because they are not content-based.  *See, e.g.*, *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, No. 17-CV-576-JDP, 2020 WL 1689705, at *11–17, *21 (W.D. Wis. Apr. 7, 2020). This Court believes it is more accurate to say that such regulations *are* content-based as that term is defined in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), but nevertheless require only a lesser level of scrutiny.  *Cf.* 1 Rodney Smolla & Melville Nimmer, *Freedom of Speech* § 2:68 ("Content-based regulation does not always result in the application of heightened scrutiny.").  The result of this case is the same under either framing.

most up-to-date test, the "crucial first step in the content-neutrality analysis" is "determining whether the law is content neutral on its face." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). A regulation of speech is facially content-based if it draws distinctions "based on the message a speaker conveys," *id*. at 163, or "singles out specific subject matter for differential treatment," *id*. at 169. For example, "a law banning the use of sound trucks for political speech—and only political speech— would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id*. at 169 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

*Reed* and *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), illustrate how this test for facial content neutrality works. At issue in *Reed* was a sign code that defined different types of signs based on the subject matter of the sign—temporary directional signs, political signs, ideological signs, and more— and subjected each category to different size and location restrictions. 576 U.S. at 164. The sign code was obviously content-based on its face, the Supreme Court said, since the government invariably had to look at the content of the sign to determine how the sign was to be regulated. *Id*. Likewise, *American Association of Political Consultants* concerned a general ban on robocalls to cell phones, from which robocalls to collect government debt were exempted. 140 S. Ct. at 2346. The Supreme Court said this:

> Under § 227(b)(1)(A)(iii), the legality of a robocall turns on whether it is "made solely to collect a debt owed to or guaranteed by the United States." A robocall that says, "Please pay your government debt" is legal. A robocall that says, "Please donate to our political campaign" is illegal. That is about as content-

based as it gets. Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech.

*Id.*

Turning to the case at hand, recall that the County's ordinance exempts four categories of signs from the general requirement that a permit be obtained before any sign is published: (1) small signs, (2) governmental signs, (3) "sculptures, fountains, mosaics and design features which do not incorporate advertising or identification," and (4) temporary noncommercial signs. Ord. § 807-3(C). GEFT does not challenge exemption (1) for small signs. The other three exemptions are plainly content-based under *Reed*. The ordinance defines governmental signs, design features not incorporating "advertising or identification," and temporary noncommercial signs in § 801-2, and it regulates those sign categories differently in § 807-3(C). The County has no way to tell what regulations to apply to a sign unless it reads the content of the sign's message and categorizes it. "The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign." *Reed*, 576 U.S. at 164.

The off-premises advertising ban also makes the sign ordinance content-based after *Reed*. The County prohibits off-premises commercial signs but allows on-premises commercial signs that meet certain objective requirements. *See* Ord. § 807-6(B)(5). Distinctions between off-premises and on-premises signs are inherently content-based because the government must evaluate the content of the sign (that is, whether the sign relates to activities occurring on-site) to determine whether the sign

11

is an on-premises sign that is subject to the permit requirement or an off-premises sign that is almost always prohibited. "The fact that a government official has to read a sign's message to determine the sign's purpose is enough, under *Reed*," to make the law content-based. *GEFT Outdoor, LLC v. City of Westfield*, 491 F. Supp. 3d 387, 405 (S.D. Ind. 2020) (collecting cases and finding that a city's on-premises/off-premises distinction was content-based); *see also GEFT Outdoor, LLC v. Consol. City of Indianapolis*, 187 F. Supp. 3d 1002, 1016 (S.D. Ind. 2016) (same).

In its briefs, the County disclaims any intent to engage in content-based discrimination. The County says the lack of such a purpose is sufficient to show that the ordinance is content-neutral. For that proposition, the County cites *Hill v. Colorado*, 530 U.S. 703 (2000), where the Supreme Court upheld a statute banning the "knowing approach" for the purpose of "oral protest, education, or counseling" within eight feet of a non-consenting person who is within 100 feet of a healthcare facility. *Hill* describes the government's content-neutral purpose as the "principal inquiry" in deciding whether a regulation is content-based. 530 U.S. at 719 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). But the Supreme Court in *Reed* squarely rejected the idea that a law is content-neutral so long as the legislature did not *intend* to discriminate on the basis of content. *See Reed*, 576 U.S. at 165 ("A law that is content based on its face is subject to strict scrutiny *regardless* of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." (emphasis added)); *id*. at 168 ("We have repeatedly rejected the argument that discriminatory treatment is suspect under the

First Amendment only when the legislature intends to suppress certain ideas." (cleaned up)).  To be sure, that is not the only part of *Hill*'s reasoning that no longer carries water.  *Compare Hill*, 530 U.S. at 721 ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."), *with Reed*, 576 U.S. at 164 (suggesting that examining the content of speech to determine how it should be regulated made the challenged ordinance content-based).

Even if the County lacked any invidious motive in enacting the sign ordinance, the ordinance distinguishes between speech based on the speech's subject matter and regulates each category of speech differently.  The sign ordinance is therefore facially content-based because it contains exemptions (2)–(4) and the on-premises/off-premises commercial sign distinction.

　　2.　Level of Scrutiny

Having found parts of the Sign Standards facially content-based, the Court proceeds to the more difficult question of what level of scrutiny applies to the distinctions the ordinance draws.

In two recent First Amendment cases, the Supreme Court has said without qualification that *all* content-based laws are subject to strict scrutiny: "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163; *see also Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2347 n.5 (dismissing the

more nuanced approach to analyzing content neutrality urged in Justice Breyer's partial dissent). Neither of the controlling opinions in these cases directly addressed exceptions to the general rule.

For over forty years, however, the Supreme Court has applied "an intermediate standard of review that accounts for the subordinate position that commercial speech occupies in the scale of First Amendment values." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (cleaned up). Commercial speech is any "speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989)). When addressing restrictions that burden only commercial speech, the Supreme Court has applied the following standard:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The *Central Hudson* test has been described as "intermediate" scrutiny. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011) (Breyer, J., dissenting).

What makes the instant case difficult is that the *Reed* rule—that all content-based regulations must pass strict scrutiny, *see* 576 U.S. at 163–64—has no limiting principle. If the rule were applied without reservation, the law governing categories of speech never thought to be subject to First Amendment protection would be

upended. For instance, prohibitions of speech amounting to fraud are technically content-based and thus subject to strict scrutiny under the unqualified terms of *Reed*—we have to look at the content of the speech to determine that it is fraud. *See Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2361 (Breyer, J., concurring in part and dissenting in part) (positing that categories of proscribable speech like obscenity, fraud, and speech integral to criminal conduct would become content-based and subject to strict scrutiny if the *Reed* rule were strictly applied).

The same is true of commercial speech—we must look at the content of speech to determine whether it is commercial or noncommercial. Thus, if *Reed* is applied without limitation, then nothing remains of the decades-old commercial-speech doctrine. This collision between precedents has led at least one circuit court to hold that, after *Reed*, "the intermediate-scrutiny standard applicable to commercial speech under *Central Hudson* . . . applies only to a speech regulation that is content-neutral on its face."[6] *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020). Other circuits have chosen to continue following the commercial-speech doctrine where there is doubt about *Reed*'s application. *See, e.g.*, *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44–45 (2d Cir. 2019); *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 136–37 (3d Cir. 2020); *Lone Star Security & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1200 (9th Cir. 2016);

---

[6] The Sixth Circuit did not explain how *any* commercial-speech regulation could be content-neutral if *Reed*'s rule were applied unflinchingly. This Court cannot conceive of any way for a government official to determine whether speech is commercial or noncommercial unless the official examines the content of the speech. And if an officer did that, he would appear to "single[] out specific subject matter for differential treatment," *Reed*, 576 U.S. at 169, subjecting the commercial/noncommercial distinction to strict scrutiny.

*Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 981 (10th Cir. 2020).  The Seventh Circuit has acknowledged the potential conflict between *Central Hudson* and *Reed* but has not yet had occasion to resolve it.  *See Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859, 860 (7th Cir. 2019).

GEFT and the County rigorously debate the fate of *Central Hudson* post-*Reed*.  The Court must resolve the conflict to decide what level of scrutiny to apply to the sign ordinance's distinction between on-premises and off-premises commercial signs.  But the Court is not writing on a blank slate.  The Supreme Court upheld an identical distinction in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–12 (1981).  In *Metromedia*, the Supreme Court applied intermediate scrutiny under *Central Hudson* and rejected the petitioner's argument that an on-premises/off-premises advertising distinction made the challenged billboard regulation unconstitutional.  *Id*.  In relevant part, the Supreme Court held that "offsite commercial billboards may be prohibited while onsite commercial billboards are permitted."  *Id*. at 512 (7-2 holding on this point).

Given the understanding of content neutrality announced in *Reed* and applied in *American Association of Political Consultants*, it is possible that the current Supreme Court would have decided this part of *Metromedia* differently.  However, when the reasoning supporting the holding of a Supreme Court case erodes over time, lower courts should generally still credit the case's holding unless and until the Supreme Court expressly overrules the case.  *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct

application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn . . . earlier authority sub silentio.").  It would be improper for the Court to depart from *Metromedia* when the Supreme Court has never expressly overruled it.  *Accord GEFT Outdoor, LLC v. Consol. City of Indianapolis*, 187 F. Supp. 3d at 1016–17 (following *Metromedia* rather than *Reed* and applying intermediate scrutiny to an off-premises commercial billboard ban); *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, No. 17-CV-576-JDP, 2020 WL 1689705, at *11–17 (W.D. Wis. Apr. 7, 2020) (same); *Peterson v. Vill. of Downers Grove*, 150 F. Supp. 3d 910, 928 (N.D. Ill. 2015) (same, but with respect to a different content-based commercial distinction), *aff'd on other grounds*, 939 F.3d 859.  *Metromedia* is directly on point.  Hence, intermediate scrutiny applies to the on-premises/off-premises commercial sign distinction.

Next, the Court turns to the issue of what level of scrutiny applies to the three content-based exemptions from the ordinance's permit requirement at Ordinance § 807-3(C)(2)–(4).  By their terms, exemptions (2) and (3) govern both commercial and noncommercial speech.  Governmental speech certainly can be commercial in nature.  *See, e.g., Am. Ass'n Pol. Consultants*, 140 S. Ct. at 2344 (amendment to Telephone Consumer Protection Act's ban on robocalls excepted robocalls for the purpose of collecting government debt).  Likewise, a design feature incorporating "identification" may be noncommercial—for instance, imagine a church that wants to post a mural

identifying the church's name and denomination. And when a content-based distinction could affect both commercial and noncommercial speech, the more stringent level of scrutiny should apply. *See Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 708–09 (5th Cir. 2020) (warning against "parsing" speech-affecting laws and applying strict scrutiny to a billboard regulation that covered both commercial and noncommercial speech); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 n.15 (11th Cir. 2005) (ordinance that applied to both commercial and noncommercial signs had to be analyzed under strict scrutiny rather than *Central Hudson*). Because exemptions (2) and (3) create content-based distinctions of noncommercial speech, they are presumptively unconstitutional and can survive only if they pass strict scrutiny. *See Reed*, 576 U.S. at 163.

What level of scrutiny applies to exemption (4) for temporary noncommercial signs is a tougher question. Exemption (4) draws distinctions in two ways. First, it draws a distinction between temporary commercial and temporary noncommercial signs, subjecting the former to the general permit requirement but not the latter. But favoring noncommercial speech over commercial speech is entirely consistent with the commercial-speech doctrine. *See Metromedia*, 453 U.S. at 513–14 (invalidating parts of billboard regulation that favored commercial speech over noncommercial speech, stating that regulation "invert[ed]" the hierarchy of First Amendment protections); *cf. Am. Ass'n Pol. Consultants*, 140 S. Ct. at 2346 (invalidating exemption that in effect favored debt-collection speech over political speech). Beyond arguing that *Reed* overturns decades of caselaw sub silentio—which the Court

18

rejects—GEFT points to no authority for the proposition that a noncommercial/commercial distinction in which noncommercial speech is treated more favorably than commercial speech must pass strict scrutiny. At the most, the distinction must pass intermediate scrutiny because it subjects temporary commercial signs meeting certain size and allocation rules to a permit requirement, whereas temporary noncommercial signs of the same size and allocation do not need a permit; in other words, this first distinction created by exemption (4) treats commercial speech less favorably than noncommercial speech.

Second, exemption (4) also draws a distinction between temporary noncommercial signs and noncommercial speech in governmental signs or design features not incorporating advertising or identification. Temporary noncommercial signs must meet different size and allocation standards to be exempted from the permit requirement, whereas noncommercial signs that fall within exemptions (2) and (3) need not. Thus, this distinction is a content-based distinction between different kinds of noncommercial speech, rendering it subject to strict scrutiny under *Reed* if exemptions (2) and (3) survive strict scrutiny. This is consistent with another case out of this district involving GEFT, in which the Court held that an Indianapolis sign ordinance's permit exemption for "noncommercial opinion signs"—signs expressing some noncommercial viewpoint—created a content-based distinction subject to strict scrutiny. *See Geft Outdoor LLC v. Consol. City of Indianapolis*, 187 F. Supp. 3d at 1014. That holding made sense because the "noncommercial opinion sign" exemption

regulated noncommercial viewpoint signs differently from other exempted noncommercial signs. So too here as to exemption (4).

3. Application

The on-premises/off-premises commercial sign distinction easily passes intermediate scrutiny. Indeed, GEFT only analyzed the provision under strict scrutiny and apparently made no effort to argue that the distinction fails intermediate scrutiny. The standard from *Central Hudson* is quoted above and will not be repeated. First, no one disputes that GEFT's intended speech has at least some First Amendment protection—GEFT's speech would not mislead or concern unlawful activity. *See Cent. Hudson*, 447 U.S. at 566. Second, the County's asserted government interests supporting the on-premises/off-premises commercial distinction are aesthetics and traffic safety. *See* Ord. §§ 807-1(3), (4). In *Metromedia*, the Supreme Court endorsed these interests as "substantial" under the *Central Hudson* test. 453 U.S. at 509–11. The Court stated, "It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Id*. at 510 (footnote omitted). Likewise, the Court acknowledged the "accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id*. at 509. Thus, the County has substantial interests at stake.[7] Third, the on-premises/off-premises commercial distinction "directly advances" the County's

---

[7] Under a regime of intermediate scrutiny, the County need not produce detailed reports or scholarly studies to prove that these interests are substantial. *See Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 503 (S.D.N.Y. 2009) (collecting cases).

interests in aesthetics and traffic safety, and the distinction is not "more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566. A local government justifiably "may believe that offsite advertising, with [its] periodically changing content, presents a more acute problem than does onsite advertising." *Metromedia*, 453 U.S. at 511. The Supreme Court wrote,

> San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere.

*Id.* at 512. Following the Supreme Court's lead, then, this Court must conclude that the County's on-premises/off-premises commercial sign distinction survives intermediate scrutiny.

Next are the exemptions to the Sign Standards' permit requirement. Pursuant to strict scrutiny, the County must demonstrate that the exemptions at Ordinance § 807-3(C)(2)–(4) are "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163, 171 ("[I]t is the Town's burden to demonstrate that the Code's differentiation between temporary directional signs and other types of signs, such as political signs and ideological signs, furthers a compelling governmental interest and is narrowly tailored to that end."). The County seemingly has not attempted to justify the exemptions under strict scrutiny. Presumably, the same two government

interests are urged: aesthetics and traffic safety. Assuming *arguendo* that these interests are compelling, the Sign Standards and exemptions are not at all narrowly tailored to those ends. Start with exemption (2) for governmental signs. As far as aesthetics go, a city may just as likely erect a garish billboard as anyone else would. Yet, a community center would need to obtain a permit for its ugly sign, and the city would not. Relatedly, a city's billboard could be just as distracting to drivers as a church's billboard. Yet, a community center would need a permit for its distracting sign, and the city would not. The same is true of exemption (3) for design features not incorporating advertising or identification. A wordless mosaic would be exempted from the permit requirement, but a mosaic that identifies a community center's name would need a permit. Yet one is not inherently less distracting to drivers or prettier than the other by nature of such identification or lack thereof.

What's left is exemption (4) for temporary noncommercial signs. Since exemptions (2) and (3) are constitutionally infirm but—as explained *infra*—severable, the first content-based distinction created by exemption (4) between different kinds of noncommercial speech is out of the picture. That obviates the need to analyze exemption (4) under strict scrutiny. Rather, the remaining distinction created by exemption (4) is a distinction between temporary noncommercial signs, on the one hand, and commercial signs of any duration that are not otherwise exempted or prohibited, on the other.[8] As previously stated, favoring noncommercial speech over

---

[8] GEFT did not challenge the fourth exemption's distinction between temporary and permanent noncommercial signs as an impermissible time, place, and manner restriction, so the Court will not address that issue.

commercial speech is unobjectionable given that commercial speech is a lower value speech category in First Amendment jurisprudence. *See Metromedia*, 453 U.S. at 513–14. Accordingly, whether rational-basis review or intermediate scrutiny applies, this commercial/noncommercial distinction passes muster. Again, the County has substantial interests in traffic safety and aesthetics. *See id.*, 453 U.S. at 509–11. The commercial/noncommercial distinction directly advances it by targeting what the County identifies as the biggest economic driver of billboard proliferation: commercial signs. (*See* Br. Opp. Pl.'s Mot. Summ. Judg. at 19, ECF No. 64.) Moreover, the means-ends fit is sufficiently tailored to satisfy intermediate scrutiny.

To summarize: The off-premises commercial sign prohibition passes intermediate scrutiny. The exemptions at Ordinance § 807-3(C)(2) and (3) do not survive strict scrutiny; and, once those are struck, the exemption at § 807-3(C)(4) survives both rational-basis review and intermediate scrutiny.

### 4. Severability

Having found parts of the Sign Standards constitutionally infirm, the Court must decide how to remedy the constitutional violation: by striking the problematic portions of the ordinance or striking the permitting scheme in whole. GEFT wants the Sign Standards struck in whole, and the County urges otherwise. Because severability as to Count I may obviate the need for certain legal inquiries with respect to Count II, the Court engages in the severability analysis piecemeal.

The Supreme Court has remarked before that "[s]everability of a local ordinance is a question of state law . . . ." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

23

750, 772 (1988) (citing *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 274 (1936)). It is not clear why that is so, especially when—as here—a challenged law does not involve a limiting construction imposed by state courts.  Severability is simply a question of statutory interpretation.  *See Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2349 (framing inquiry as determining "Congress's 'actual intent' as to severability"). And basic rules of statutory interpretation generally do not change from jurisdiction to jurisdiction.  Perhaps that is why *American Association of Political Consultants* favorably cited a case in which the Supreme Court severed, without reference to state severability doctrine, "discriminatory wine-and-cider amendments" from an underlying state statute generally prohibiting the manufacture of alcohol.  *See id.* at 2353 (citing *Eberle v. Michigan*, 232 U.S. 700, 704–05 (1914)).  In any event, the state severability law versus federal severability law issue need not be resolved here. Indiana's law of severability is not unique.  And, in analyzing severability, Indiana courts draw from Supreme Court caselaw on severability in federal statutes.  *See, e.g.*, *Ind. Ed. Emp. Rels. Bd. v. Benton Cmty. Sch. Corp.*, 365 N.E.2d 752, 761–62 (Ind. 1977) (relying on *Carter v. Carter Coal Co.*, 298 U.S. 238 (1935), which reviewed a federal law).  The Court therefore draws on both state court cases and the Supreme Court's most recent discussions of severability.

Severability concerns "whether the infirm provision of a statute is severable, leaving the remainder intact." *City of Hammond v. Herman & Kittle Props., Inc.*, 119 N.E.3d 70, 87 (Ind. 2019) (citation omitted).  That inquiry may be broken down into two questions: (1) "whether the statute can stand on its own without the invalid

24

provision," and (2) "whether the legislature intended the remainder of the statute to stand if the invalid provision is severed." *Id.* If the answer to either question is negative, "the offending provision is not severable, and the whole statute must be stricken." *Id.* "The inclusion of a severability clause creates a presumption that the remainder of the Act may continue in effect." *Ind. Ed. Emp. Rels. Bd.*, 365 N.E.2d at 762. The Indiana Supreme Court has noted before that a severability clause is "only one indication of legislative intent." *Id.* at 761. However, under the currently prevailing modes of statutory interpretation,

> When Congress includes an express severability or nonseverability clause in the relevant statute, the judicial inquiry is straightforward. At least absent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause. That is because a severability or nonseverability clause leaves no doubt about what the enacting Congress wanted if one provision of the law were later declared unconstitutional.

*Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2349 (7-2 holding on this point). The presence of a severability clause thus creates a "strong presumption of severability." *Id.* at 2356.

> Here, the County's zoning ordinance contains a severability clause, which states,

> The provisions of this ordinance are separable. If any part or provision of these regulations or the application thereof to any person or circumstances is adjudged invalid by a court of competent jurisdiction, such judgment shall be confined in its operation to the part, provision, or application directly involved in the controversy in which such judgment shall have been rendered and shall not affect or impair the validity of the remainder of these regulations or the application thereof to other persons or circumstances. The County hereby declares that it would have enacted the remainder of these regulations even without any such part, provision or application.

Ord. § 800-6(D). "[F]irm adherence to the text of severability clauses," *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2356, leads the Court to the conclusion that the clause

is all but dispositive of the County's legislative intent: that exemptions (2) and (3) be severed.

GEFT argues at length that the County would not have enacted the Sign Standards without all of the exemptions. Although the exemptions were not a trivial part of the permitting scheme, the Court cannot simply ignore that the County has expressly stated its intent that "it would have enacted the remainder of these regulations even without any [constitutionally unsound] part, provision or application." Ord. § 800-6(D).

GEFT also argues that severing the infirm exemptions without striking the entire scheme would make administering the ordinance unduly burdensome by subjecting more speech to the permit application process. County Planning Director Larry Wilson did testify that, without the exemptions, "[i]t would be impossible to address all the signs that are out there." (Wilson Dep. Tr. 32:14–19, ECF No 54-2.) For one, Mr. Wilson seems to be discussing a resource problem—one that could be addressed by hiring more staff or, if that fails, by future as-applied challenges. Additionally, the Court is only invalidating two of the four exemptions, mitigating administrability concerns. The permitting scheme does not seem facially unworkable without exemptions (2) and (3), and GEFT has not attempted to show that removing those exemptions would empirically cause an unworkable inundation of sign applications. And, as far as constitutionality, the Court thinks the permit scheme can "stand on its own without the invalid provision," *Herman & Kittle Props.*, 119 N.E.3d at 87,

26

because removing exemptions (2) and (3) fully addresses the constitutional deficiencies in the Sign Standards, at least with respect to Count I.

The exemptions in § 807-3(C)(2) and (3) are therefore severable.

*B.  Count II: Prior Restraint*

In Count II, GEFT argues that the County's sign scheme is a prior restraint that lacks the substantive and procedural safeguards required of prior restraints.  The County counters that those requirements are either fulfilled or unnecessary.

1. Legal Rule

A prior restraint is any law "forbidding certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  Prior restraints are "highly disfavored and presumed invalid."  *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002) (citations omitted).  But a prior restraint is not per se unconstitutional, and it may pass muster under the First Amendment if it meets one of several exceptions "carved out" by the courts.  *Stokes v. City of Madison*, 930 F.2d 1163, 1168– 69 (7th Cir. 1991).

The County's sign regulations resemble a prior restraint.  The general rule of the Sign Standards is that no sign may be published unless the County first issues a permit.  Ord. § 807-3.  The Sign Standards therefore "[give] public officials the power to deny use of a forum in advance of actual expression."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

As the Sign Standards meet the definition of a prior restraint, the Court must evaluate the constitutional status of the restraint.  As relevant here, two lines of cases have sprouted around prior restraints: one focused on substantive limits on official discretion and one focused on procedural safeguards.  Which specific limits on discretion are required depend on whether the law in question is content-neutral or content-based.  *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002).  All prior restraints—even content-neutral time, place, and manner regulations[9]—must substantively "contain adequate standards to guide the official's decision and render it subject to effective judicial review."  *Id.* at 323.  A content-based law, however, must also contain the stringent procedural protections announced in *Freedman v. Maryland*, 380 U.S. 51, 58 (1965).  *See Thomas*, 534 U.S. at 322.  In *Freedman*, the Supreme Court held that a state's film-review scheme was unconstitutional because it lacked three procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990) (citing *Freedman*, 380 U.S. at 58–60).  Similarly, *FW/PBS* involved a licensing scheme that "target[ed] businesses purveying sexually explicit speech," 493

---

[9] GEFT has not argued that the County's ordinance fails to satisfy other requirements of time, place, and manner jurisprudence, under which a permit scheme "must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication."  *Thomas*, 534 U.S. at 323 n.3 (citations omitted).  Accordingly, the Court will not address those other requirements.

U.S. at 224, prompting the Supreme Court to require of the challenged regulation variants of two of the *Freedman* safeguards, *see Thomas*, 534 U.S. at 322 n.2. *FW/PBS* clarified that the first two *Freedman* safeguards included a requirement that a "license for a First Amendment-protected business must be issued within a reasonable period of time . . . ." 493 U.S. at 228. According to GEFT, the Sign Standards fail to comply with any of these prior-restraint principles.

Since the procedural side of these prior-restraint rules only comes into play when a regulation is "content-based," *Thomas*, 534 U.S. at 322, the Court must determine what the labyrinthine term "content-based" means in the context of prior restraints. The *Freedman* procedural safeguards only apply to the Sign Standards if *Freedman* applies to a prior restraint that is content-based by reason of an on-premises/off-premises commercial-speech distinction.[10] Neither GEFT nor the County addressed two questions that the Court believes are important to this inquiry: (1) whether prior-restraint doctrine applies at all to a regulation of commercial speech, and (2) whether the *Freedman* doctrine applies to a "content-based" regulation of commercial speech.

The Seventh Circuit has not decided whether prior-restraint jurisprudence applies at all to regulations of commercial speech. The circuits that have weighed in disagree. *Compare Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d

---

[10] Recall that the Court is considering severability piecemeal (i.e. immediately after it finds any given provision constitutionally infirm). *See supra* Section III.A.4. Had exemptions (2) and (3)—content-based distinctions of noncommercial speech—survived strict scrutiny, the *Freedman* safeguards would certainly be necessary in order for the Sign Standards to also survive as a permissible prior restraint. Since the Court has already severed the infirm exemptions, however, the Court will proceed to the question of whether a content-based *commercial-speech* regulation triggers the *Freedman* requirements.

509, 532 (6th Cir. 2012) (declining to apply prior-restraint doctrine to commercial-speech regulation, noting that Supreme Court had never done so), *with In re Search of Kitty's East*, 905 F.2d 1367, 1371–72 & n.4 (10th Cir. 1990) (holding prior-restraint analysis was applicable to commercial-speech regulation but skimping on any explanation why), *and N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 131 (2d Cir. 1998) (requiring "procedural safeguards" in state agency's exercise of prior restraint when speech at issue was both commercial and political in nature).  *See also Bellion Spirits, LLC v. United States*, 393 F. Supp. 3d 5, 28 (D.D.C. 2019) (noting that "it seems reasonably clear that the prior-restraint doctrine does not even apply to commercial speech").  Even those circuits that have analyzed commercial-speech restrictions as prior restraints have not consistently imposed the *Freedman* procedural safeguards.  *See Nutritional Health All. v. Shalala*, 144 F.3d 220, 228 (2d Cir. 1998) (not mentioning *Freedman* and considering only whether the challenged commercial-speech regulation substantively conferred unbridled discretion on government officials).

The Supreme Court has never said whether prior-restraint rules apply to commercial-speech regulations, but it has winked and nudged.  Start with *Central Hudson*.  In dicta, the Court said it had previously "observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it."  *Cent. Hudson*, 447 U.S. at 571 n.13 (citing *Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748, 771–772 n.24 (1976)); *see also Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 668 n.13 (1985) ("The

Court previously has noted that, because traditional prior restraint principles do not fully apply to commercial speech, a State may require a system of previewing advertising campaigns to insure that they will not defeat state restrictions." (citations omitted)).   Not only is commercial speech more "sturdy" than other varieties of speech, but it also "occurs in an area traditionally subject to [state and local] government regulation," the Supreme Court said.  *Cent. Hudson*, 447 U.S. at 562 (citation omitted).   Notably, *Central Hudson* and its predecessors dealt with "prophylactic bans on speech," but none of those cases engaged in a prior-restraint analysis.  *See Discount Tobacco*, 674 F.3d at 532 n.7.

Also relevant is *Metromedia*.  *Metromedia*—which, again, is good law until the Supreme Court expressly states otherwise, *see supra* Section III.A.2—did not require regulations distinguishing between on-premises and off-premises commercial signs to comport with *Freedman*, even though that distinction is in some sense content-based.  Like *Central Hudson*, *Metromedia* did not engage in a prior-restraint analysis.  The decision's only mention of *Freedman* is in passing as part of a footnote about severability.  *See Metromedia*, 453 U.S. at 521 n.26.

Moreover, the Court considers that the Supreme Court has tended to backpedal from the procedural safeguards first announced in *Freedman*.  In *FW/PBS*, the controlling plurality opinion only applied variants of two of the original three safeguards, finding the third, regarding a "prompt final judicial decision," unnecessary.  *See FW/PBS*, 493 U.S. at 228 ("Because the licensing scheme at issue in these cases does not present the grave dangers of a censorship system, we conclude

that the full procedural protections set forth in *Freedman* are not required." (cleaned

up)).  And, as previously stated, *Thomas* held that *none* of the *Freedman* protections

was necessary to a content-neutral time, place, and manner regulation.  *See Thomas*,

534 U.S. at 322.  The last time the Supreme Court substantively addressed the

*Freedman* procedures was in *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774

(2004).  There, too, the Court retreated from *Freedman*.  *See id.* at 781 ("Littleton, in

effect, argues that we should modify *FW/PBS*, withdrawing its implication that

*Freedman*'s special judicial review rules apply in this case.  And we accept that

argument.").

Having reviewed all of these cases, this Court tends to agree with those courts

that have refused to apply the full panoply of prior-restraint safeguards to regulations

of commercial speech.  First, the Court will continue to credit the characterization of

commercial speech as a "sturd[ier]" form of expression than other kinds of speech.

*Cent. Hudson*, 447 U.S. at 571 n.13.  As previously stated, a district court is not at

liberty to assume that Supreme Court cases have been overruled sub silentio.  *See*

*Rodriguez de Quijas*, 490 U.S. at 484.  Second, the "the paradigmatic standards

characterizing prior restraints generally involve amorphous benchmarks about

public welfare or morality."  *Bellion Spirits*, 393 F. Supp. 3d at 29 (citations omitted).

"The standards regulators apply to commercial speech, conversely, are typically

susceptible to clearer enforcement criteria."  *Id*.  That is certainly true in this case—

the on-premises/off-premises commercial sign distinction is objective, not

"amorphous."  *See* Section III.B.2.  Thus, "laws that might otherwise be prior

restraints applied in the commercial-speech context present less of a risk of chilling protected expression—the concern that undergirds" the Supreme Court's analysis of prior restraints of noncommercial speech. *Bellion Spirits*, 393 F. Supp. 3d at 29 (citing *Se. Promotions, Ltd.*, 420 U.S. at 558–59). Third, "because nearly all human action—and so state regulation—operates through communication, the First Amendment possesses near total deregulatory potential," Amanda Shanor, *The New Lochner*, 2016 WIS. L. REV. 133, 176 (2016), if all prophylactic regulations of commercial speech are subjected to the stringent *Freedman* procedures. Furthermore, if the Court were to require every commercial regulation resembling a prior restraint to comply with *Freedman*, it would call into question the states' longstanding traditional police power to regulate businesses and intrastate commerce. All this is to say that the Court does not believe that the full prior-restraint safeguards are required in the commercial-speech context.

The next question is whether that answer changes when a prophylactic regulation of commercial speech is "content-based." *Thomas*, 534 U.S. at 322. The on-premises/off-premises commercial sign distinction at § 807-6(B)(5) makes the Sign Standards partially "content-based," at least as that phrase is understood in *Reed*. *See supra* Section III.A.1. Unfortunately, the Supreme Court's unqualified statements in *Reed* about content-based regulations, obliquely reformulating the content-neutrality test,[11] make it hard to tell how *Reed* and *Thomas* interact. GEFT

---

[11] To be sure, *Reed* did upend the circuit courts' understanding of content neutrality. *See, e.g.*, *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 160 n.7 (3d Cir. 2016) (describing *Reed* as a "drastic change in First Amendment jurisprudence"); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1332–33 (11th Cir. 2017) (en banc) (Tjoflat, J., dissenting) (noting that

argues that *Reed*'s updated definition of "content-based" retroactively requires content-based regulations of commercial speech to contain the arduous *Freedman* procedures.  Content-based is content-based, no matter whether commercial speech is at issue, GEFT says.

*Thomas* and *Reed*, read in isolation, indeed suggest that content-based prior restraints of commercial speech must contain the full *Freedman* procedures.  *Thomas* involved a city's park-use ordinance that required individuals to obtain permits before hosting events of fifty persons or more.  534 U.S. at 322.  Previewing *Reed*, *Thomas* implied that "subject-matter censorship" was a form of content-based regulation.  *Id.*  In finding that *Freedman* did not apply to the park-use ordinance, *Thomas* distinguished the park-use ordinance—an obviously content-neutral regulation of conduct—from regulations that appear to target speech, like those in *Freedman* (licensing scheme targeting obscene films) and *FW/PBS* (licensing scheme targeting adult businesses).  *See id.* at 322–23.  Here, because the County's sign ordinance directly targets signs—indisputably speech—rather than generalized conduct, the County's sign ordinance is arguably more like the challenged laws in *Freedman* and *FW/PBS* than the park-use ordinance in *Thomas*.

Nevertheless, it is not immediately clear why a government's act of disfavoring off-premises commercial messages should raise as severe a free-speech concern as the seemingly more sinister act of disfavoring films or businesses carrying messages to which such government morally objects.  It is critical to remember what *Thomas* and

---

"*Reed* announced a sea change in the traditional test for content neutrality under the First Amendment").

*Reed* did not say: They did not say commercial speech is of equal value to noncommercial speech, and they did not say that every prophylactic regulation distinguishing between different kinds of commercial speech needs the procedural safeguards in *Freedman*.  That being so, it simply strains belief that the Supreme Court in *Reed* meant to implicitly extend the judge-made *Freedman* doctrine to situations where such procedural safeguards have never been required.  GEFT essentially asks this Court to (1) ignore the Supreme Court's warnings that lower courts should not read its cases to implicitly overrule older cases, (2) find that the Supreme Court implicitly overruled several decades' worth of commercial-speech cases, and (3) find that the Supreme Court also implicitly broadened *Freedman* to reach all prophylactic regulations under which a government must examine the subject matter of a message to decide how to regulate the message.  The Court must decline that invitation.[12]

In sum, the Court will not require the Sign Standards—although they may be in a sense content-based under *Reed* because of the on-premises/off-premises commercial sign distinction—to comport with the *Freedman* procedural rules.  To do so would be to create new law when GEFT has not persuasively justified its position.  At most, prophylactic content-based commercial-speech regulations must contain substantive limits on official discretion.

---

[12] *Accord Adams Outdoor Advert.*, 2020 WL 1689705, at *21 ("Adams Outdoor's assertion that these regimes must meet the standards articulated in *Freedman* is incorrect. . . . [S]ign regulations that draw distinctions between off-premises commercial signs and other kinds of signs are not considered content based under *Metromedia*.").

2.  Unbridled Discretion

Since the Court finds that *Freedman*'s procedural safeguards are not mandatory here, the only question is whether the Sign Standards substantively run afoul of the requirement that any prior restraint "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 322.  Put another way, any prior restraint must bound the government's discretion using "narrow, objective, and definite standards." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969).

GEFT first says the off-premises commercial sign prohibition gives the County too much discretion.  Recall that the sign ordinance defines an off-premises commercial sign as any commercial sign that "directs attention to a business, commodity, service or entertainment not conducted, sold or offered on the premises where the sign is located, or which business, commodity, service or entertainment forms only minor or incidental activity upon the premises where the sign is displayed." Ord. § 801-2.  By its terms, the Court does not see how this definition is so broad that it gives the County "unbridled discretion." *Plain Dealer Publ'g Co.*, 486 U.S. at 757.  If a standard like "unreasonable danger" is narrow enough for the Supreme Court, *see Thomas*, 534 U.S. at 324, then the County's comparably specific definition of "off-premises commercial sign" here is certainly narrow enough for this Court.  In its briefs, GEFT posits three examples of purportedly ambiguous signs under that definition.  (*See* Pl.'s Reply Br. at 25–26, ECF No. 68.)  But the Court has no trouble categorizing those examples as either off-premises commercial signs or other types of signs.

In further support of its argument, GEFT points to County Planning Director Larry Wilson's alleged description of the off-premises sign definition as "muddy" and Mr. Wilson's practice of sometimes referring to counsel the question of whether a certain sign constitutes an off-premises commercial sign.  (*See* Wilson Dep. Tr. 23:23– 26:16, ECF No. 54-2.)  For one, GEFT's citations to the record here are misleading. Mr. Wilson did not say that the question of whether a given sign constitutes an off-premises commercial sign is "muddy"; he said, "[T]he *constitutional law* in this area is muddy. Even the *Reed* case is muddy."  (*Id.* at 25:24–25 (emphasis added).)  The Court can hardly disagree that *Reed* has muddied the waters of First Amendment law.  *See generally* Section III.A.  Additionally, Mr. Wilson says he sometimes refers tough sign-classification questions to the County's attorneys because Mr. Wilson is not a lawyer.  (*Id.* at 26:14–16.)  The Court struggles to see why that practice is at all objectionable.  In any event, whether an ordinance contains sufficiently "narrow, objective, and definite standards," *Shuttlesworth*, 394 U.S. at 151, is a question of law for the Court, and Mr. Wilson's deposition testimony does not change the Court's conclusion that the sign ordinance's definition of "off-premises commercial sign" does not come close to granting unbridled discretion to the County.

GEFT also contends that the variance process associated with the Sign Standards grants unbridled discretion to the County.  The Court agrees that the variance process confers too much discretion on the County in two ways.

First, the standards guiding the BZA in considering a variance application are vague.  For use variances, these standards include criteria such as whether the

variance would be "injurious to the public health, safety, and general welfare"; whether the surrounding property would be "affected in a substantially adverse manner"; whether a denial of a variance would cause "unnecessary hardship"; and whether a variance would "interfere substantially with the Comprehensive Plan." Ord. § 812-5. The design variance standards are comparable. *See* Ord. § 812-6. These factors are "value laden and susceptible to wide and varying differences of opinion." *Bickers v. Saavedra*, 502 F. Supp. 3d 1354, 1362 (S.D. Ind. 2020); *see also Int'l Outdoor*, 974 F.3d at 698 ("The standards for granting a variance contained multiple vague and undefined criteria, such as 'public interest,' 'general purpose and intent of this Chapter,' 'adversely affect[ing],' 'hardship,' and 'practical difficulty.'"); *Shuttlesworth*, 394 U.S. at 159 (striking permit scheme in which permits' issuance was "guided only by [City Commission's] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"); *Lakewood*, 486 U.S. at 769–70 (invalidating licensing scheme in which mayor could issue permits if it was "in the public interest"). These kinds of nebulous criteria create too high a risk that the BZA might grant or deny a variance based on whether it likes or dislikes the content or viewpoint of a given sign. Using this subjective variance procedure, the BZA could essentially permit whatever speech it favored, even if such speech appeared on a sign flouting countless design and use standards in Chapter 807, while requiring disfavored speech to abide by every sign standard to a T.

Second, the BZA has the power to approve variances contingent on any condition imposed "to protect the public health, and for reasons of safety, comfort and

convenience." Ord. § 812-7.  That standard does little to constrain the County.  The County could impose essentially whatever conditions it wanted on a sign approved through the variance process, which constitutes impermissibly broad discretion.  *See Lakewood*, 486 U.S. at 769–70 (holding unconstitutional part of ordinance giving mayor discretion to impose "such other terms and conditions [he] deemed necessary and reasonable" when granting a newsrack permit); *Bickers*, 502 F. Supp. 3d at 1363 (holding unconstitutional ordinance provision giving city power to condition grant of special-use permit on whatever terms city "deem[s] necessary to protect adjoining property owners").

The County counters that the variance process, which controls regular variances for real property and variances from the sign ordinance alike, should not be considered part of the sign ordinance.  The County says the State of Indiana should answer for any constitutional problems inherent to the variance process, since Indiana requires local governments to adopt a variance process whenever they establish a zoning ordinance.  *See* Ind. Code § 36-7-4-901.  But the County has not pointed out any part of the Indiana Code requiring the County to consult the same criteria governing real-property variances, which usually do not implicate First Amendment interests, when considering variances from the sign ordinance, which much more often implicate the First Amendment.  To the contrary, the County could have enumerated a separate set of "narrow, objective, and definite standards," *Shuttlesworth*, 394 U.S. at 151, for the BZA to apply when considering variances from the Sign Standards.

The County also argues that the variance provision cannot be considered a prior restraint because it potentially provides relief from the Sign Standards rather than increasing the amount of suppressed speech.  The Sixth Circuit rejected this specific argument in *International Outdoor*, reasoning that "the variance provision of the City of Troy Sign Ordinance . . . is not independent from other provisions of the ordinance, but rather inextricably linked to them by providing a way of relaxing the very restrictions imposed by the Sign Ordinance."  974 F.3d at 702.  The Court agrees with that reasoning.  The variance process is not independent of the Sign Standards because the County chose to regulate variances from the Sign Standards using the generalized variance process in Chapter 812.  As applied to variances from the Sign Standards, the variance process does not sufficiently constrain official discretion.

   3.  Severability

In short, the Sign Standards do not need the *Freedman* procedural protections, but the variance process does substantively confer unbridled discretion on the County.  For substantially the same reasons as stated *supra* in Section III.A.4, the Court credits the severability clause at Ordinance § 800-6(D) and finds that the variance process in Chapter 812 is invalid but severable insofar as it applies to variances from the Sign Standards.  Insofar as it regulates zoning decisions that do not implicate the First Amendment, the variance procedure stands.

*C.  Count III: Relief Under Indiana Code*

The Court has supplemental jurisdiction to consider the state-law cause of action asserted in Count III.  *See* 28 U.S.C. § 1367.

Under Indiana Code §§ 36-7-4-1614(d) and 36-7-4-1615, a court may grant relief from an unlawful zoning decision that causes prejudice. Such court "may" set aside the zoning decision and either (1) remand the case to the applicable board of zoning appeals or, alternatively, (2) "compel a decision that has been unreasonably delayed or unlawfully withheld." Ind. Code § 36-7-4-1615.

Here, neither of these options is appropriate. Although GEFT's facial challenge to the ordinance succeeds in part, remand would accomplish nothing. Because the Court is striking the ordinance's generalized variance provision in Chapter 812 as it applies to variances from the Sign Standards, there would be no variance mechanism at all on remand, and GEFT's variance application would lead nowhere. For similar reasons, compelling a decision in GEFT's favor would be improper. The standards from which GEFT sought variances—Ordinance §§ 807-6(B)(2), 807-6(B)(5), 807-6(D), 807-6(F)(1), 807-6(F)(2), and 807-6(F)(3)—remain intact after today's decision, so GEFT's proposed sign still does not comport with the Sign Standards. Accordingly, the Court must decline GEFT's request for relief under Indiana Code §§ 36-7-4-1614(d) and 36-7-4-1615.

*D. Damages*

The remaining issue is the amount of damages GEFT has sustained from the County's denial of its variance application. The County moves for summary judgment on damages, but its briefs did not address GEFT's purported lack of damages beyond

41

arguing that there were none given that the ordinance was constitutional in full.  The Court has found otherwise above.  Thus, a jury must pass on the issue of damages.

## IV.    Conclusion

In summary, *Reed* opened a can of worms in the sense that it announced a general rule that the Supreme Court has not yet had the chance to refine.  But the Court will not read that case as extensively as GEFT urges.

The cross-motions for summary judgment, (ECF Nos. 53, 63), are each **granted in part** and **denied in part**.  On Count I, summary judgment is granted in favor of GEFT only as to the exemptions at Ordinance § 807-3(C)(2) and (3).  On Count II, summary judgment is granted in favor of GEFT only as to the generalized variance procedure's application to the Sign Standards.  The ban on off-premises commercial signs survives GEFT's facial challenge, as does the exemption at Ordinance § 807-3(C)(4).  On Count III, summary judgment is granted in favor of the County.  The issue of damages must proceed.

The County is hereby **permanently enjoined** from (1) enforcing the exemptions in Ordinance § 807-3(C)(2) and (3)—i.e., continuing to exempt those kinds of signs from the permit requirement—and (2) applying the variance process in Chapter 812 to variances from the sign requirements in Chapter 807.

The infirm provisions of the County's sign ordinance are severable, so the Sign Standards are otherwise enforceable.  The variance process may remain in effect as applied to zoning decisions that do not implicate First Amendment-protected speech.

No order that the County allow GEFT to erect its digital billboard shall issue, as the ordinance comports with the First Amendment after today's decision.

Finally, the Magistrate Judge is invited to meet with the parties and discuss resolution of the damages claim short of trial.

**SO ORDERED.**

Date: 8/10/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

A. Richard M. Blaiklock
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Zachary J. Stock
POLLACK LAW FIRM PC
zstock@pollacklawpc.com

Charles R. Whybrew
LEWIS WAGNER, LLP
cwhybrew@lewiswagner.com